**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| DARREN KEVIN JONES, | \* |
| | \* |
| | \*   C.A. No. 8:15-cv-01173-GJH |
| Plaintiff, | \* |
| | \* |
| v. | \* |
| | \* |
| | \*   DEMAND FOR JURY TRIAL |
| OFFICER GARY ALLEN, et al., | \* |
| | \* |
| | \* |
| Defendants. | \* |

**PLAINTIFF'S MOTION TO EXCLUDE THE TESTIMONY OF**
**DEFENDANTS' EXPERT WITNESSES**

This case arises out of a shooting by officers of the Prince George's County Police Department of Plaintiff, Darren Jones, who was a passenger in a vehicle driven by a friend, Carlos Barksdale ("Barksdale"). On April 5, 2014 Plaintiff accompanied Barksdale to a residence located at 8610 Temple Hills Drive for the purpose of retrieving an all-terrain vehicle which Plaintiff intended to borrow. The residence was that of Andrea Battle ("Battle"), the estranged mother of Barksdale's child. When Battle perceived that Barksdale was on her property, she telephoned the police. Defendant Officers Gary Allen ("Allen") and Kevin Powell ("Powell") were dispatched, and shortly thereafter arrived at the Battle residence. At that time, Barksdale was already in his vehicle – a black Honda - and Plaintiff was just outside of the vehicle. As the officers approached the vehicle, Barksdale set the vehicle in motion. Plaintiff jumped into the vehicle. The officers opened fire, striking both Plaintiff and Barksdale as the black Honda left the scene.

Plaintiff brought this lawsuit against Allen, Powell, and other officers involved in the arrest, charging, and prosecution of Plaintiff.  Collectively, the Defendants have tendered two expert witnesses:  Barry Levine, Ph.D, a forensic toxicologist; and Emanuel Kapelsohn, an attorney and weapons expert purporting to have expertise in police practices and various other subject matters.  Each "expert" has submitted his report and curriculum vitae in accordance with Rule 26 of the Federal Rules of Civil Procedure, and the Court's Scheduling Order.  Dr. Levine's report demonstrates that he intends to testify regarding matters which are wholly irrelevant, inadmissible, and undoubtedly prejudicial to Plaintiff.  Mr. Kapelsohn's report and CV show that he does not possess the requisite knowledge, skill, experience, training, or education to support the broad array of opinions that he asserts.  Moreover, his testimony is unreliable and unlikely to assist the trier of fact. Therefore, Plaintiff hereby moves this Honorable Court to exclude the testimony of these witnesses pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), Rules 702 and 703 of the Federal Rules of Evidence, and additional case precedent as set forth below.  As grounds for this motion, Plaintiff states as follows:

## A.  Barry Levine, Ph.D., FABFT

Barry Levine, Ph.D., submitted a one page report in relation to this case.  See, Report of Barry Levine, attached as Exhibit A.  Dr. Levine reviewed Plaintiff's medical records from MedStar Washington Hospital Center, where Plaintiff had been airlifted after the shooting. Among the information contained in the medical records were the results of blood tests conducted on Plaintiff, including a blood alcohol concentration (BAC).  The records indicate that Plaintiff's BAC at 2:31 p.m. on the date of the shooting was 0.06 – 0.07 g/100mL. Dr. Levine relied upon this information for his opinion that:

"Most individuals with a BAC of 0.06 – 0.07 g/100mL would be impaired by alcohol.  Specifically, an individual would show impairment in abilities to perceive events or changes in events, to react to events, and to make judgments and decisions relative to the individual's abilities in the absence of alcohol."

Exhibit A.

Dr. Levine does not indicate in his report that he intends to testify that Plaintiff was impaired or intoxicated at the time of the shooting, yet Plaintiff can only surmise that it is the intent of Defendants to use Dr. Levine for that purpose.  Federal Rules of Evidence 401 to 403 provide the definition and parameters of relevant information.  Rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." In determining what relevant evidence is, and whether such evidence should be admissible, the court must find that such evidence is properly provable in a case. Fed.R.Evid. 401, Advisory Committee Notes, 1972 Proposed Rules ("Relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case. Does the item of evidence tend to prove the matter sought to be proved?"). Similarly, Rule 402 provides that irrelevant evidence should be inadmissible, and relevant evidence is also inadmissible according to various laws in certain circumstances. As such, Rule 403 provides one law of certain circumstances that relevant evidence that is prejudicial is inadmissible. Under Rule 403, "relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403. Under circumstances where relevant evidence may prejudice the jury, the court must balance the "probative value of and need for the evidence against the harm likely to result from its admission." *Id.* at Advisory

3

Committee Notes, 1972 Proposed Rules. See also, <u>United States of America v. Hall</u>, 653 F.2d 1002, 1006 (5th Cir.1981).

Here, any evidence that Plaintiff was impaired is both irrelevant and inadmissible. Plaintiff was of the age of majority and legally permitted to consume alcohol in Maryland on April 5, 2014.  There is no evidence that he operated a motor vehicle that day, which is the only circumstance that would otherwise make his BAC relevant.  That notwithstanding, the law in Maryland would not deem Plaintiff impaired/prohibited from *driving* solely on the basis of a BAC of 0.06 – 0.07 g/100mL.  See, MD Code, Courts and Judicial Proceedings, § 10-307.  Dr. Levine's report is devoid of any facts that he would rely upon to suggest that Plaintiff was impaired other than BAC.  Moreover, the report references no facts which would render the opinion relevant or admissible (i.e., what activities performed by Plaintiff were impaired).  In that regard, the report rejects the existing legal standard (to legally operate a vehicle) in favor of a standard of Dr. Levine's own making.

Clearly, Defendants wish to influence the jury by injecting into this case the inflammatory issue of alcohol consumption.  To allow Dr. Levine to testify to that which he provides in his report, would invite overwhelming prejudice against Plaintiff.  Without doubt, whatever probative value Dr. Levine's opinions may have is far outweighed by the prejudice of allowing evidence that Plaintiff was impaired in Dr. Levine's eyes, if not by any legal standard. As such, Dr. Levine should be excluded from testifying at the trial of this case.

### B.  Emanuel Kapelsohn

1.  <u>Kapelsohn's Background</u>

Mr. Kapelsohn submitted, in conjunction with his report, a 55-page curriculum vitae.  See Kapelsohn CV, attached as Exhibit B.  Kapelsohn is a trained lawyer, duly licensed to practice in the state of Pennsylvania.  He holds a bachelor's degree in English Literature in addition to his *Juris Doctor*.  He has extensive training in the use of firearms, and undoubtedly can claim expertise in that field.  Kapelsohn has worked as a lawyer, as a firearms training consultant, as a Director of Security, as a part-time private detective, and as the President of his own company – The Peregrine Corporation.  His CV is replete with "training courses attended", seemingly the source of his claimed expertise.  The CV bears no evidence of formal, accredited education in police work; no evidence of attendance at or graduation from a police academy; no evidence of any full-time, or formal, employment with a law enforcement agency; and no training courses lasting more than one week.  In addition, Kapelsohn's CV contains no evidence of any scientific background, education, training, experience or knowledge whatsoever.

2. Kapelsohn's Reports

In this case, Mr. Kapelsohn has submitted a fourteen-page report dated January 19, 2016 (attached as Exhibit C), and a two-page supplement, dated February 10, 2016 (attached as Exhibit D).  His initial report indicates that he is relying on his "education, training and experience in the fields of firearms and ballistics, officer-involved shootings, shooting scene reconstruction, police training, police policies, police tactics, and police use of force."  Ex. D, p. 2.  He describes in excruciating detail his life as an expert witness.

Mr. Kapelsohn offers a wide-ranging set of opinions within his report.  He appears to be qualified to offer few of them under the legal standard.  Often throughout the report, Mr. Kapelsohn offers statements which rely on nothing more than his self-imposed "expertise."  For example, on page 8 of his report, Mr. Kapelsohn describes testing that he did of the Defendant

officers related to the time it took them to draw and fire their weapons.  Ex. C, p. 8.  He offers no insight into how the testing was conducted, the instrument(s) used, margin of error, the variables considered, the application of the testing to the underlying facts, nor any basis for his qualification to conduct such testing.

He later uses the results of the draw and fire testing, and applies them to the speed of the Barksdale vehicle in order to render an opinion on the position of the vehicle when Allen fired at it.  He states, "A Honda Accord is about 16 feet long."  He provides no basis for this conclusion. He then leaps into complete speculation, stating "[r]emebering that the '5-7 mph' is just an estimate, not a precise speed measurement, if the Honda had in fact been moving 4 mph (5.86 feet per second) rather than 5 mph, then the Honda would have moved only 6.7 feet while Officer Allen drew and fired his first shot."  Ex. C, p.8.  There is no evidence from any witness that the vehicle was moving 4 mph.

Kapelsohn goes on to render opinions on: human reaction time (Ex. C, p. 9); human performance (Ex. C, p. 9); the capabilities of automobiles (Ex. C, p. 10); scene reconstruction (Id.); the tendencies of officers making radio broadcasts (Ex. C, p. 11); and human behavioral science (Ex. C., pp. 12-13).  All such opinions are rendered without a basis in science that Kapelsohn has demonstrated he is qualified to provide.  Specifically, Plaintiff objects to the opinions offered by Mr. Kapelsohn which fall into four general categories: opinions pertaining to use of force; opinions based on experiments conducted by Kapelsohn; opinions pertaining to behavioral science, generally; and opinions with their genesis in a fact for which Kapelsohn provides no reference.  Examples[1] of these opinions are:

---

[1] Plaintiff objects to 42 distinct opinions contained in Kapelsohn's two reports, collectively.

1. "Because cars are capable of turning or reversing in virtually any direction, and capable of doing so in very short time intervals, this policy that officers should avoid placing themselves in situations "where vehicles **may** strike them" cannot reasonably be interpreted to mean that an officer must not approach a motor vehicle as Officers Allen and Powell did here." (Ex. C., p. 6).

2. "[W]hen the Honda unexpectedly came toward him, Officer Allen tried to get out of the way. His discharging his handgun at the Honda after it came toward him and struck him was not, in my opinion - and apparently in the opinion of the PGCPD as well -- a use of force prohibited by the PGCPD Use of Force Policy." (Ex. C., p. 6).

3. "When I timed the officers in their ability to draw and dry fire their handguns on January 8, 2016, Officer Allen's times ranged from approximately 1.2 seconds to 1.4 seconds, with the longest single time being 1.48 seconds. Officer Powell's times ranged from approximately 1.15 seconds to 1.35 seconds, with a single "slow" performance of 1.58 seconds." (Ex. C., p. 8).

4. "If it took Officer Allen 1.15 seconds to draw and fire, as he did when I timed him, the Honda would have moved about 8.4 feet in that time. A Honda Accord is about 16 feet long. This would place Officer Allen about halfway back the length of the car, which is where he said he was when he began firing. Remembering that the "5-7 mph" is just an estimate, not a precise speed measurement, if the Honda had in fact been moving 4 mph (5.86 feet per second) rather than 5 mph, then the Honda would have moved only 6.7 feet while Officer Allen drew and fired his first shot." (Ex. C., p. 8).

5. "The instant in time of the shot - and the angle and location at which the shot enters the target - is not indicative of the instant, and angle, at which the officer decided to fire, or at which he initiated the finger/trigger movement that, a fraction of a second later, discharged the shot." (Ex. C., p. 9).

6. "Firing service pistols like the M&P .40 caliber sidearms used by Officers Allen and Powell, my timing tests and those of many other instructors and researchers indicate that officers can typically fire at the rate of at least 4-5 shots per second (one shot every 0.25 to 0.33 second), with some officers firing at the rate of 0.20 second "split times" (shot-to-shot times)." (Ex. C., p. 9).

7. "Just as a certain reaction time lag is a fact of human performance in an officer's beginning to fire once he perceives a threat at which he has been trained to fire, similarly there is also a reaction time needed to stop firing when an officer perceives that the threat that justified him in firing has ceased." (Ex. C., p. 9).

8. "In the human factors laboratory, where stress levels are low and the "stop firing" signal is unambiguous, subjects typically fire one to two shots after the "stop firing" signal is given." (Ex. C., pp. 9-10).

9. "Based on the speed with which these officers can draw and dry fire, and data about how fast most officers can fire shot-to-shot, it is quite possible that Officer Allen's six shots could have been fired in about a second and a half *(1.5* seconds) from first shot to last, and that Officer Powell's three shots could have been fired in about half a second *(0.5* second) from first shot to last. This was, in other words, not necessarily a long event, by any means." (Ex. C., p. 10).

10. "[H]aving just driven his vehicle at a police officer and (by the officer's account) striking him, Barksdale was still in possession of a deadly weapon in the form of the car ("ability"), was still close enough to Officer Allen to change direction and hit Allen in a very short time ("opportunity"), and had already evidenced an intent (or at least a willingness) to place the officer's life in "jeopardy" or 'imminent danger'." (Ex. C., p. 10).

11. "My experience, to the contrary, is that officers' radio broadcasts after shots have been fired are often disjointed and incomplete." (Ex. C., p. 11).

12. "In many officers, this body alarm reaction causes perceptual changes and physical responses that have been widely studied, are the subject of numerous scholarly and scientific articles, and have been part of the training curriculum of law enforcement officers and their instructors throughout the country for several decades." (Ex. C., p. 12).

13. "I have worked in numerous cases, debriefed officers after shootings, and have had several experiences myself where auditory exclusion prevented me from hearing everything from shots fired, to someone yelling in my face." (Ex. C., p. 12).

14. "Based on my interviews with Officers Allen and Powell and the nature of what occurred, it is apparent that this was an extremely stressful event that affected their normal perceptual abilities." (Ex. C., p. 13).

15. "The injuries suffered by the plaintiff could have been avoided by his not jumping into the moving car when the police ordered him not to get into the car, and if his colleague had not driven the car over a curb and toward a uniformed police officer in broad daylight, while two police officers were commanding him to stop the car." (Ex. C., p. 14).

## LAW AND ARGUMENT

### (I) The Legal Standard for Excluding Expert Testimony

An expert may state an opinion or conclusion if the subject matter is appropriate, the witness is qualified, the witness possesses a reasonable probability regarding the opinion, the opinion has a proper factual basis, and the information used to form that basis of the opinion is

8

the type reasonably relied upon by experts in the particular field. Giddings v. Bristol-Myers

Squibb Co., 192 F. Supp.2d. 421 (D.Md. 2002), citing Daubert, at 596. The Federal Rules

permit a witness such as Mr. Kapelsohn, who purports to be "qualified as an expert by

knowledge, skill, experience, training, or education," to offer opinion testimony only if each one

of the following four criteria are met:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to

understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 is often assessed in conjunction with Rule 703, which sets the

following parameters for permissible "Bases for an Expert's Opinion Testimony":

> "An expert may base an opinion on facts or data in the case that the expert has
> been made aware of or personally observed. If experts in the particular field
> would reasonably rely on those kinds of facts or data in forming an opinion on the
> subject, they need not be admissible for the opinion to be admitted. But if the
> facts or data would otherwise be inadmissible, the proponent of the opinion may
> disclose them to the jury only if their probative value in helping the jury evaluate
> the opinion substantially outweighs their prejudicial effect."

Fed. R. Evid. 703. When applying these two Rules, the Court's ultimate task is to determine

whether the proffered opinion testimony (1) "rests on a reliable foundation" and (2) "is relevant

to the task at hand." Newell Rubbermaid, Inc. v. Raymond Corp., 676 F.3d 521, 527 (6th Cir.

2012), quoting Daubert, at 597.

9

Courts have noted "the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to 'opinion' testimony.'" Daubert at 588-89, quoting Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 169 (1988). Yet, even against this "permissive backdrop," trial courts are by no means "disabled from screening such evidence." Daubert at 589. "To the contrary, under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Id.

Daubert warned that this judicial filter is particularly important because an expert, "[u]nlike an ordinary witness," is "permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." Daubert at 592, citing Fed. R. Evid. 702 and 703. The "common law insist[s] upon 'the most reliable sources of information," and perhaps the "most pervasive manifestation" of this principle is the "usual requirement of firsthand knowledge." Daubert at 592, quoting the Advisory Committee's Notes on Fed. R. Evid. 602. To the extent Rule 702 relaxes this requirement, such "relaxation… is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." Daubert at 592.

Thus, the "gatekeeping role for the judge" is paramount, even at the risk of "prevent[ing] the jury from learning of authentic insights and innovations." Id. at 597. This is "the balance that is struck by Rules of Evidence [that are] designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes." Id. Daubert "suggested a 'flexible' list of factors for a district court to consider" when deciding whether scientific testimony is reliable: "(1) whether a theory or technique ... can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) general acceptance." Jones, at 1156, citing Daubert, at

593-94. To that end, Mr. Kapelsohn seeks to opine on scientific matters without the requisite scientific education, training, experience, skill or knowledge.

The reliability standards set forth in Daubert do apply to both scientific and non-scientific testimony. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147 (1999) ("this basic gatekeeping obligation … applies to all expert testimony"). However, the Daubert factors are "non-exhaustive" and "cannot readily be applied to measure the reliability of such testimony." Surles ex rel. Johnson v. Greyhound Lines, Inc., 474 F.3d 288, 295 (6th Cir. 2007), citing Kumho Tire, 526 U.S. at 150 ("the four specific factors utilized in Daubert may be of limited utility in the context of non-scientific expert testimony"). In those cases, the inquiry must broaden, since the "general reliability of non-scientific expert testimony does not always neatly separate itself from whether the particular expert in the case is qualified and whether the testimony will be helpful to the trier of fact…." U.S. v. Jones, 107 F.3d 1147, 1154-55 (6th Cir. 1997).

A more befitting reliability test for non-scientific experts is whether they "adequately "explain[ed] how th[eir] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Surles, at 296, citing the Advisory Committee's Note to Fed. R. Evid. 702. "Experience is to nonscientific experts as experimentation is to scientists." U.S. v. Jones, 107 F.3d 1147, 1155 (6th Cir. 1997).  Thus, the "relevant reliability concerns may focus upon personal knowledge or experience" rather than scientific testing. Surles, at 295. A "non-scientific expert's experience and training bear a strong correlation to the reliability of the expert's testimony." Jones at 1155.

The Sixth Circuit has recently reiterated the "[r]ed flags that caution against certifying an expert." Newell Rubbermaid, Inc. v. Raymond Corp., 676 F.3d 521, 527 (6th Cir. 2012). Some

11

of those "red flags … include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." Id., And "if a purported expert's opinion was prepared solely for litigation, that may also be considered as a basis for exclusion." Id., citing Johnson v. Manitowoc Boom Trucks, Inc., 484 F.3d 426, 434 (6th Cir. 2007).

**(II) Application to the Present Case**

**(a)    Mr. Kapelsohn's training, methods, and purported field of expertise are questionable.**

Applying the factors set forth above to Kapelsohn's opinions, it is readily apparent that they are based much more on mere conjecture than they are on solid scientific theory. Kapelsohn's opinions are not the product of scientifically reliable methods and principles required under federal law. Kapelsohn does inject individual stories into his report, but he falls short of explaining how his experience leads to the conclusions reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.

Specifically, Kapelsohn relies upon, and is heavily influenced by, the work of William Lewisnski, Ph.D.[2]  Plaintiff's expert, R. Paul McCauley, Ph.D., calls Kapelsohn's qualifications into question in his rebuttal report, [3] dated April 11, 2016:

> "Mr. Kapelsohn refers to being trained as a force science analyst by the Force Science Institute and its company's founder psychologist Dr. William Lewinski. Dr. Lewinski's research methodologies and lack of peer reviewed publications have been criticized by researchers, which give rise to the question, Is the Force Science Institute teaching officers/analysts to do the wrong things well? A New York Times report stated in part;

---

[2] See citations to Lewinski's work at Ex. C, pp. 9, 12.  See also, reference to training with Lewinski at Ex. B, at pp. 12, 13.
[3] See Supplemental Report of R. Paul McCauley, Ph.D., attached as Exhibit E.

'Because he published in a police magazine and not a scientific journal, Dr. Lewinski was not subjected to the peer-review process. But in separate cases in 2011 and 2012, the Justice Department and a private lawyer asked Lisa Fournier, a Washington State University professor and an American Journal of Psychology editor, to review Dr. Lewinski's studies. She said they lacked basic elements of legitimate research, such as control groups, and drew conclusions that were unsupported by the data. "In summary, this study is invalid and unreliable," she wrote in court documents in 2012. "In my opinion, this study questions the ability of Mr. Lewinski to apply relevant and reliable data to answer a question or support an argument . . .'

Clearly, any demonstrations and opinions Mr. Kapelson offers based on his Force Science training must be examined carefully in light of potential pseudoscience/junk science."

Lewinski has been excluded as an expert witness in many cases for precisely the same issues of credibility and or qualification that are being raised in the instant case with regard to Kapelsohn.[4]  This court should carefully consider the conclusions that other courts have reached on the precise issue, prior to allowing Kapelsohn to testify.

**(b)**   **Mr. Kapelsohn's proffered opinions do not have a sufficient factual or evidentiary basis.**

Plaintiff has identified 42 distinct opinions rendered by Kapelsohn in his report which Plaintiff finds to be objectionable.  With regard to each of these opinions, Plaintiff is concerned that Kapelsohn is simply not qualified to render these opinions as an expert.  While he has

---

[4] Cases in which the expert testimony of William Lewinski, Ph.D., has been either limited or excluded altogether include, but are not limited to:  Fernandez v. Chrisman, Unreported, No. CV-11-02001-PHX-FJM, 2012 WL 4061665, at *3 (D. Ariz. Sept. 14, 2012);  State v. Gianquitti, 22 A.3d 1161, 1165-66 (R.I. 2011);  People v. Mehserle, 206 Cal. App. 4th 1125, 1144-45; 142 Cal. Rptr. 3d 423, 439 (2012);  ADT Sec. Servs., Inc. v. Swenson, 276 F.R.D. 278, 317-18 (D. Minn. 2011);  Lopez v. Chula Vista Police Dep't, Unreported, No. 07CV1272-WQH-BLM, 2010 WL 685014, at *2 (S.D. Cal., Feb. 18, 2010);  Chaparro v. Bartos, Unreported, No. CV03-701PHXDGCCRP, 2010 WL 382889, *4-5 (D. Ariz. Jan. 28, 2010);  Tubar v. Clift, Unreported, No. C05-1154-JCC, 2009 WL 1325952, at *8 (W.D. Wash. May 12, 2009); and White v. Gerardot, Unreported, No. 1:05-CV-382, 2008 WL 4724004, at *2 (N.D. Ind. Oct. 24, 2008).

certainly taken many "training classes" in Use of Force, Mr. Kapelsohn has none of the knowledge, skill, experience, training, or education typical of experts in this field.  He has no accredited training in any police-related matters, and his practical experience consists of ride-alongs as a "Special Deputy."  See  Ex. D, p. 4 ("Hundreds of hours accompanying police and security officers and/or participating in patrol and enforcement activities throughout the United States and several foreign countries . . ."").  This law enforcement experience is *de minimis* at best, and could not be less specific in terms of substance.  The lack of knowledge, skill, experience, training, or education manifests itself in a report that is full of conclusory opinions and statements with little support in evidence or reliable resources.

By way of example, Kapelsohn's opinions regarding reaction time lag, body alarm reaction, auditory exclusion, distorted perceptions, tunnel vision, and distorted perception of time, are not based on his own research.  That notwithstanding, he points to no experience, training or knowledge which would enable him to present these opinions as anything more than a lay person who has read some articles or attended a training session.

With regard to the subset of opinions which have their basis in scientific measurement, the behavioral sciences, physiological response to outside stimuli, and automobile performance/capability, Kapelsohn has demonstrated no expertise whatsoever.  He simply provides opinions, without reference or citation to any credible source.  These opinions are seemingly based in his own logic, but certainly not based in traditionally accepted scientific principle.  By way of example, Kapelsohn's opinions regarding reaction time lag, body alarm reaction, auditory exclusion, distorted perceptions, tunnel vision, and distorted perception of time, are not based on his own research.  That notwithstanding, he points to no experience,

training or knowledge which would enable him to present these opinions as anything more than a lay person who has read some articles or attended a training session.

Kapelsohn presents opinions based on his measurements of "draw and fire" times of Defendants, Allen and Powell.  But his data bears little relation to the actual evidence.  Allen testified at deposition that prior to discharging his weapon, he was struck by the Barksdale vehicle, which caused him to lose his balance.  Deposition of Gary Allen, attached as Exhibit F, at p. 59: 14; 74:2-3; 89:10-11.  He further testified that after he "fell to the ground . . . [t]hat's when I came up and began to draw fire."  Id., at p. 91:19-22.  Kapelsohn makes no mention of this evidence in his report.  Neither does his draw and fire testing for Allen take into account the amount of time it would take him to recover his balance, get up, and begin to shoot.  Kapelsohn's analysis fails to relate adequately to the evidence, and is therefore irrelevant.[5]

If he is permitted to testify, Kapelsohn will attempt to disguise his advocacy in a cloak of what other experts have called pseudoscience, and will attempt to bolster the testimony of the officer defendants with scientific-sounding terminology that, when examined closely, is based on agenda-driven research that lacks any of the characteristics of valid science.

---

[5]Dr. McCauley states in his report, "Mr. Kapelsohn reported that he timed [in a laboratory setting] the officers' total time for drawing and firing multiple shots with the time to the first shot. The missing elements of the equation(s) are the officer's various human motion factors, biomechanics, including anatomical stress, physical body positioning, terrain/surface, and clothing restrictions, as examples that collectively contribute to the total reaction times **from the moment PO Allen fell near the front-side of the Honda, recovered, and fired**."  Ex. E, at p. 3.

## CONCLUSION

For all of the foregoing reasons, Emanuel Kapelsohn should be excluded from this case pursuant to Daubert v. Merrell Dow Pharmaceuticals, and Rules 702 and 703 of the Federal Rules of Evidence.

Dated:  May 25, 2016

**/s/ Stephen P. Norman, Esq._____**
Stephen P. Norman, Esq. Bar No.: 29202
THE NORMAN LAW FIRM
30838 Vines Creek Rd., Unit 3
Dagsboro, Delaware 19939
Tel: 302-537-3788
Facsimile: 302-258-0705
Snorman@TheNormanLawFirm.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 25th day May, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system.

Dated:  May 25, 2016

/s/ Stephen P. Norman, Esq.
Stephen P. Norman, Esq. Bar No.: 29202
THE NORMAN LAW FIRM
30838 Vines Creek Rd., Unit 3
Dagsboro, Delaware 19939
Tel: 302-537-3788
Facsimile: 302-258-0705
Snorman@TheNormanLawFirm.com
*Attorneys for Plaintiffs*