

# The Peregrine Corporation

Specialists in Defense Dynamics

January 19, 2016

Gessesse Taliferi, Esq.
Prince George's County Office of Law
County Administration Building, Room 5121
Upper Marlboro, MD 20772

       Re:  Darren Kevin Jones v. Officer Gary Allen, et al.

Dear Attorney Taliferi:

      I am writing to provide my expert report in the above-referenced  matter, as follows:

### Preparation for Rendering Opinions

      In preparation, I have reviewed information your office has provided to me in hard copy form, by email, and on a computer disk, including: Prince George's County Police Department ("PGCPD") Incident Report and related documents;  witness statements and police interviews with Darren Jones, Andrea Battle, Aaron Robinson, Shanee Robinson, Officer Gregory Powell, Officer Gary Allen, Evidence List, CAD history (Law); CAD history (Fire); Crime Scene Processing Report; laboratory analysis requests, PGCPD Firearms Identification Unit ballistics reports and worksheets; police color photographs of the scene, evidence, the involved officers and their equipment, and officer and subject injuries;PGC Police Academy materials; vehicle towing and disposal documents; plaintiff's Rule 26 disclosures, expert reports and related information of David Balash, R. Paul McCauley, Christine Trankiem, M.D., and Derek Masden, M.D.

      In addition, on January 8, 2016, I inspected physical evidence at the PGCPD Property unit, including  Officer Allen's and Officer Powell's service pistols and magazines, fired and unfired cartridge cases, recovered projectiles, a folding knife, items of clothing worn by the plaintiff and by the driver during the incident, and seat cloth from the front passenger seat of the subject vehicle.

      On that same date, I visited the scene of the incident with Officers Allen and Powell, and did a "walk through" of the incident there with them.  I also spoke with both officers.   After leaving the scene, at a PGCPD district station, I made some measurements of the officers, and timed their drawing of their handguns from the same holsters they used during the incident.

1771 CREEKVIEW DR. • FOGELSVILLE, PA 18051 • peregrine@ptd.net • (484) 504-1345

## Qualifications to Render Opinion

I am also relying on my education, training and experience in the fields of firearms and ballistics, officer-involved shootings, shooting scene reconstruction, police training, police policies, police tactics, and police use of force. My experience with firearms has been acquired over the past fifty-seven (57) years, the last thirty-five (35) of which have been in a professional capacity. I have served as an expert witness in state and federal courts throughout the United States since 1984, both for the prosecution and for the defense in criminal matters, and for plaintiffs and defendants in civil suits, including numerous suits alleging excessive or negligent use of force by police. I have provided opinions and testified both for and against police officers and police departments.

I have taught police use of force, firearms and tactics at the police academy (recruit) level, in-service police officer level, police instructor and federal agency instructor level, and in the Criminal Justice Department at Indiana University. Among other things, I have taught police use of force in a series of senior instructor courses for the Federal Bureau of Alcohol, Tobacco & Firearms, taught in Orlando, Los Angeles, San Diego, and San Francisco; have taught the module on "Use of Force in Law Enforcement" for about six years at the Allentown, Pennsylvania Police Academy, and taught a senior seminar entitled "Police Use of Force" in the Criminal Justice Department at Indiana University in Bloomington, Indiana. I have also taught use of force in numerous regional, national, and international police instructor conferences (IALEFI, ASLET, ILEETA, etc.) held throughout the country over the past 25 years or more.

I have served on the Pennsylvania Municipal Police Officers Education & Training Commission ("MPOETC") Curriculum Development Committee that wrote the basic police academy curriculum on firearms and use of force used to train police officers in all police academies throughout the Commonwealth of Pennsylvania for the past 14 years. I am currently working with the MPOETC on the revisions to that curriculum now being implemented statewide. I have also worked with the MPOETC in developing a mandatory in-service use of force class that will be taught this year to some 25,000 police officers throughout the Commonwealth of Pennsylvania. During the past three months, I have helped to teach a pilot of that class, and an instructor-training program in preparation for the roll-out of that program.

I have also written, revised, and consulted on the firearms and use of force policies of the Berks County Sheriff's Department, where I have served as a Special Deputy Sheriff for the past 19 years. I have also taught police use of force programs for the Greene County, Indiana, Prosecutor's Office, when I lived in Indiana and was a Reserve Deputy Sheriff there from 2008 through 2012. For approximately the past 23 years, with the exception of one year, I have conducted law enforcement firearms instructor recertification training for all certified police firearms instructors in Atlantic County, New Jersey on a rotating 3-year cycle for each group of instructors. This recertification training includes review, discussion, and testing on the standards applicable to the use of deadly force, including national and federal constitutional standards.

I have trained police firearms and tactics instructors or operators for law enforcement agencies throughout the country and elsewhere, including among many others the New York State Police (four instructor courses), the Washington, D.C. Metropolitan Police (two instructor

2

courses), the Police Departments of Philadelphia, Baltimore, Jersey City, Atlantic City, Trenton, Miami, Jacksonville, St. Petersburg, Dallas, Seattle, Phoenix, the Metropolitan Toronto Municipal Police, the Tennessee Bureau of Investigation, the Massachusetts Metropolitan Police, the Louisiana State Police, Oregon State Police, the Henrico County Police, Salt Lake County (UT) Sheriff's Department, Nevada State Fire Marshal's Office, Calgary Police Service Tactical Unit, and Maryland National Capital Park Police.

In addition to my firearms and tactics expertise, I have also been trained and certified as an instructor in the full range of police force options, including defensive tactics, pepper spray, baton (expandable and side-handle), Taser, and less lethal impact munitions. I am also trained in emergency vehicle operation, and in pursuit and evasive driving. Accordingly, I am familiar with the alternatives to deadly force that, in appropriate circumstances, may be available for use by police.

I am certified in shooting scene reconstruction, and have for years regularly testified in state and federal courts on shooting scene reconstructions, ballistics, and related issues. My work as an expert witness has included wound ballistics, which deals with the physiological damage caused by projectiles.

I note that this case also involves Smith & Wesson M&P model pistols. I am familiar with these pistols. I own one myself, have fired others, and have trained many police officers in the use of this sidearm.

I am also certified as a force science analyst, and I have regularly testified in courts for many years on force science issues. The field of force science is the application of scientific principles, research and testing to confrontations in which force is used by police officers or others. Force science involves such things as an individual's perception and evaluation of deadly threats, human factors such as reaction time, the speed with which one can cover a certain distance on foot, turn, draw and/or fire a gun, the speed at which multiple shots can be fired, the relative speed of one individual's action vs. another individual's reaction thereto, and the perceptual and physiological changes commonly experienced by individuals during high-stress use of force confrontations, sometimes described as part of the "fight or flight" or "Body Alarm Reaction" ("BAR") response.

Since 1984 I have served as an expert in roughly 300 cases, and have testified over fifty (50) times in state and federal courts throughout the United States, as well as before grand juries, administrative tribunals including the U.S. General Accounting Office, and by invitation before committees of both Houses of Congress on firearms-related issues. My expert witness clients have included the U.S. Department of Justice, the Department of Energy, the Department of the Army, the Judge Advocate General Corps in a court martial at Andrews Air Force Base, the Cities of New York, Chicago, San Diego, Pittsburgh, Nashville, Bridgeport, Atlantic City, Newark, and Camden; Palm Beach County (FL) and Pima County (Tucson, AZ); the Milwaukee District Attorney's Office and several other district attorneys and prosecutors; and the Attorneys General of Pennsylvania, Georgia, Delaware, South Dakota, and Wyoming, among others. I do not always testify in favor of the police; I have also worked as an expert and testified against the police in many cases, including ones in which I believe that improper or negligent behavior by

3

the police has resulted in harm to innocent individuals. In some cases, I have testified for criminal defendants in the same counties in which I have worked as a prosecution witness in other cases. Thus, I have worked as an expert and/or testified both for and against the City of New York, both for and against the City and County of Camden, New Jersey, both for and against the Commonwealth of Pennsylvania, both for and against firearms manufacturers, both for and against holster manufacturers, both for and against gun store owners, and both for and against the owners of shooting ranges. I have testified at trial in state courts in Connecticut, New York, New Jersey, Pennsylvania, Maryland, Tennessee, Georgia, Florida, Wisconsin, Michigan, Arizona, Oregon, and California, and in federal courts in Connecticut, New York, New Jersey, Pennsylvania and Tennessee. I have never failed to be qualified (accepted) as an expert witness in any trial in which I have been proffered for that purpose.

Further details of my education, training, experience and qualifications are contained in my curriculum vitae, provided separately.

<u>The Incident</u>

Without attempting at this point to cover every detail of what occurred, but rather to provide a general description sufficient for the discussion that follows, based on the PGCPD incident report, the incident occurred around 1:00 p.m. on the afternoon of April 5, 2014. PGCPD Officers Allen and Powell were dispatched to a domestic disturbance at the home of Andrea Battle at 8610 Temple Hills Drive. Officer Allen was a Field Training Officer and Officer Powell was his trainee; Officer Powell was driving a marked PGCPD car, and Officer Allen was riding in the passenger seat. The officers responded to the address with lights and siren activated, parked across the street from the Battle house, exited the police car and walked across the street, an undivided roadway, toward the house. The officers observed a black Honda Accord backed into the driveway of the house, with the trunk open. One suspect, Barksdale, was sitting in the driver's seat, while plaintiff Darren Jones was at the rear of the vehicle near the open trunk. As the officers approached the vehicle, Jones apparently put it into drive and began to move forward toward them. Jones ran from the trunk of the vehicle to the passenger door and, contrary to police commands, got into the moving vehicle. Officer Allen was in the roadway as Barksdale made a turn toward him. Both officers ordered Barksdale to stop the vehicle. Instead, Barksdale drove over the grass and curb, driving toward Officer Allen, who was trying to get out of the path of the Honda. Despite his efforts, Officer Allen was struck in the left leg by the Honda. Officer Allen fell part way down, caught himself with his hand on the pavement, and regained a standing position. As he did so, he drew his handgun and fired at the driver of the Honda, which Allen states was alongside and very close to him at that point. Seeing Officer Allen struck and knocked down (or partway down), and fearing that he might be dragged by the Honda, Officer Powell drew his handgun and fired as well. Both suspects were struck by the officers' shots.

Officer Allen radioed in the "shots fired" and a description of the suspect vehicle. The officers got into their police car and pursued in the direction the Honda had gone, but did not regain sight of it. Barksdale and Jones were treated at separate hospitals for their gunshot injuries. Officer Allen was treated in the emergency room for an injury to his left knee.

4

Based on the number of live rounds remaining in each officer's handgun, it appears that Officer Allen fired 6 shots, and Officer Powell fired 3 shots. However, only seven (7) fired cartridge cases in total were recovered at the scene, five of which were microscopically matched to Officer Allen's handgun, and two to Officer Powell's handgun. Possible reasons for two cartridge cases not being found are discussed below.

## Discussion and Analysis

### The Applicable Legal Standards and Agency Policy for Use of Deadly Force.

When a police officer fires his service pistol toward another person, the officer is using deadly force. See PGCPD General Order Manual, Chapter 51, "Use of Force."

Uniformly throughout the United States, including in Maryland, police officers are taught that they are justified in using deadly force to defend themselves or others against what they reasonably believe to be an imminent threat of death or serious bodily harm.

This use of force standard is in accordance with the landmark U.S. Supreme Court cases of Graham v. Connor and Tennessee v. Garner, the principles of which are taught to police nationwide. Graham v. Connor and Tennessee v. Garner are part of the use of force curriculum taught to all police officers throughout the United States. Together, these cases stand for the proposition that a police officer may use deadly force in defense of life when he reasonably believes his life or the life of another innocent person is in danger. To be justifiable, the officer's use of force must be "objectively reasonable" under the "totality of the circumstances" involved, judged:

> … from the perspective of a reasonable officer at the scene, rather than with the 20/20 vision of hindsight …   (Graham v. Connor)

In Graham, the Supreme Court also stated:

> ... The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." (Graham v. Connor)

Or, as the Supreme Court wrote in a case decided nearly sixty years before Graham, "[d]etached reflection cannot be demanded in the presence of an uplifted knife." Brown v. United States, 256 U.S. 335 (1921) (Oliver Wendell Holmes, J.).

The PGCPD General Order Manual, in Chapter 51, "Use of Force," provides that in general, firearms may only be discharged in defense of self or others when the officer reasonably believes that the subject poses an imminent threat of death or serious physical injury to himself or herself or to another person.

I note that the PGCD General Order authorizes the use of deadly force when the officer reasonably believes that the threat of death or serious physical injury posed by the subject is "imminent," whereas the Supreme Court in Graham v. Connor, in listing some of the "facts and circumstances of each particular case," said courts should pay attention to "whether the suspect poses an immediate threat to the safety of the officer or others." Plaintiff's expert, Mr. McCauley, attempts to make an issue of the difference between "immediate" (taught to police to mean a deadly threat which is being carried out this very instant) and "imminent" (taught to police to mean a threat which is about to be carried out very shortly, absent some intervening act to prevent it). However, the use of force, including if necessary deadly force, is taught to police nationwide to be justified to prevent imminent threats, not just immediate ones, and Graham has been interpreted this way in numerous court cases since it was first decided by the Supreme Court. Mr. McCauley's description of the word "imminent" in the PGCPD Use of Force Policy as a "misuse of terms," and his description of the agency's Policy as "deficient" because of its use of the word "imminent," is legally incorrect, and is contrary to accepted use of force standards accepted by the courts and taught to police nationwide.

The PGCPD policy on officers firing at threats posed by moving vehicles or subjects in those vehicles provides that officers may fire at a vehicle when the occupants of the vehicle are threatening or using deadly force by means other than the vehicle (not the case here), or when the vehicle is operated in a manner which may cause serious injury or death to another person or to an officer and there is not cover available (officers should avoid placing themselves in situations where vehicles may strike them).

There can be no doubt that a car being driven toward a person poses a threat of death or serious bodily harm, even if the car is being driven at a relatively slow speed. The black Honda was, in other words, a deadly weapon when driven toward the officers by Barksdale.

The policy proviso that "officers should avoid placing themselves in situations where vehicles may strike them" is fairly common in police agency policies, and typically means that officers should not purposely stand directly in front of vehicles, or stand in a roadway when trying to get an approaching vehicle to stop. Because cars are capable of turning or reversing in virtually any direction, and capable of doing so in very short time intervals, this policy that officers should avoid placing themselves in situations "where vehicles **may** strike them" cannot reasonably be interpreted to mean that an officer must not approach a motor vehicle as Officers Allen and Powell did here. If it meant that, the policy would prohibit officers from making most traffic stops, prohibit officers from walking across a parking lot toward a vehicle whose occupants they wished to question, etc. Officers Powell and Allen walked across the street toward the driveway where the Honda was parked. There is no indication that either officer positioned himself directly in front of the Honda to prevent it from being moved, and then fired at it when it moved forward. To the contrary, when the Honda unexpectedly came toward him, Officer Allen tried to get out of the way. His discharging his handgun at the Honda after it came toward him and struck him was not, in my opinion – and apparently in the opinion of the PGCPD as well -- a use of force prohibited by the PGCPD Use of Force Policy.

6

**The Use of Force Continuum and "Elements of Justification."**

Nationwide, many police are taught the use of force using a conceptual schematic called the "Use of Force Continuum." This Continuum rank-orders various force options from lowest (least intrusive, least likely to cause serious physical injury to the suspect) to highest (deadly force, which is the most intrusive and most likely to cause serious injury). Although the precise wording of the Continuum can vary slightly from state to state, academy to academy and year to year, the basic concept of the Use of Force Continuum is as follows:

| | |
|---|---|
| **Level I** | Officer Presence |
| **Level II** | Verbal Direction |
| **Level III** | Physical Restraint and Control (Empty Hand Control) |
| **Level IV** | Intermediate Force (kicks/strikes/baton/TASER/K9) |
| **Level V** | Deadly Force |

Officers are taught that they do not necessarily have to progress up through all of the above levels, but can move immediately to the appropriate level of force for the situation. In this incident, the PGCPD officers used Officer Presence (Level I, in the form of their uniformed presence, and their marked patrol car with lights and siren), and, Verbal Direction (Level I – their command to Jones not to get into the car, and their command to Barksdale and Jones not to move the car) in their attempt to control the suspects without resorting to any higher level of force. It was only after the suspects not only defied these levels of force, but drove toward and struck Officer Allen, that the officers resorted to deadly when they believed Officer Allen's life was in danger.

In analyzing the justification for self-defense, officers are often taught as well that there are three "elements of justification." Specifically, the officer must reasonably believe the suspect has: (1) the **ability** to cause death or serious physical harm to the officer or others (here, by virtue of the moving car); (2) the **opportunity** to cause death or serious physical harm to the officer or others (here, because the Honda is still within close range of Officer Allen); and (3) that the suspect must have taken some action that places the officer or others in **imminent danger** (also called "jeopardy") of suffering death or serious physical harm. In this incident, the suspects, who appeared to be acting in concert, had deadly ability by means of the car, had the opportunity to use the car because they were in contact or within only a second or two of being able to strike Officer Allen with it, and had placed Officer Allen in imminent danger or jeopardy when Barksdale drove toward, and struck, Officer Allen with the car. With all three elements of justification thus satisfied, the officers' use of deadly force in defense of Officer Allen was in keeping with their training, and with nationally-accepted police standards for use of force .

**The Officers' Reaction Time to Start Firing and Stop Firing vs. The Speed of the Honda; Officers' Shot-to-Shot Firing Time.**

A certain amount of "reaction time," as it is commonly called, is required between a starting stimulus and signal and the actual performance of a human action. For example, there is a time lag, albeit brief, between the sound of the starting pistol and the sprinter's movement off

the starting block. In the case of a police officer firing a gun on the shooting range, when the firearms instructor blows the whistle, the shooter must perceive the sound, decide to fire, send a nerve impulse down the arm to get the trigger finger to contract, and pull the trigger far enough rearward to discharge the shot. When the shooter already has his finger on the trigger, the signal to fire is audible, the shooter is already "primed" to hear the signal and has pre-decided what he is going to do when he hears it, the shot can typically be fired in about a quarter to a third of a second (0.25 to 0.33 second). When the signal is visual, more complex and more analysis is required – such as when an officer must decide whether the suspect's movement in reaching behind him is innocent or life-threatening – the time from the stimulus to the shot can be much longer. Actually, what is commonly called "reaction time" consists of several separate elements which can be called (1) perception time, (2) analysis or decision making time, and (3) movement time.

Police officers are trained that when their life is threatened with a weapon, their immediate response should normally be to draw their handgun and fire. The holsters used by Officers Powell and Allen are Safariland models which have a very well-designed and easily-operated rotating hood as their means of retaining the gun in the holster. This is one of the fastest police holsters in common use. When I timed the officers in their ability to draw and dry fire their handguns on January 8, 2016, Officer Allen's times ranged from approximately 1.2 seconds to 1.4 seconds, with the longest single time being 1.48 seconds. Officer Powell's times ranged from approximately 1.15 seconds to 1.35 seconds, with a single "slow" performance of 1.58 seconds.

Apparently in order to argue that the Honda must have been well past Officer Allen when Allen began firing, Mr. McCauley calculates, on page 12 of his report, that if it took Officer Allen 2.0 seconds to draw and fire (a number for which Mr. McCauley gives no explanation or justification), and if the Honda were moving at 7 miles per hour (the fastest speed estimated by the officer), then the Honda would have traveled 20.5 feet between when it hit Officer Allen and when he could have fired, so that the Honda would already have been past him.

In response, I would state that the "5 to 7 miles per hour" is only an estimate by an involved police officer, not a precise fact. If the car was moving at an average speed of 5 mph, not the maximum estimated 7 mph as Mr. McCauley used in his calculation, then it would only have been moving an average of 7.33 feet per second. If it took Officer Allen 1.15 seconds to draw and fire, as he did when I timed him, the Honda would have moved about 8.4 feet in that time. A Honda Accord is about 16 feet long. This would place Officer Allen about halfway back the length of the car, which is where he said he was when he began firing. Remembering that the "5-7 mph" is just an estimate, not a precise speed measurement, if the Honda had in fact been moving 4 mph (5.86 feet per second) rather than 5 mph, then the Honda would have moved only 6.7 feet while Officer Allen drew and fired his first shot.

Neither the officers, nor Mr. McCauley, nor I know precisely how long it took Officer Allen to draw and fire, nor how fast the car was moving and how far it moved during that time interval. My calculations, based (unlike Mr. McCauley's "two seconds") on an actual timing of Officer Allen's ability to draw and fire, serve to show that what Officer Allen has stated occurred is, in fact, quite possible.

8

Another aspect of human reaction time (comprising, as discussed, the separate elements of perception, decision, and action/movement), is that when an officer such as Officer Allen feels his life is physically threatened, as by the oncoming Honda which then strikes him, and his training tells him that he must draw and fire, a period of time will go by before he actually discharges the shot.  During this time, a moving car will continue to move, an advancing suspect with a knife will continue to advance, and a pivoting suspect will continue to rotate.  Thus, the instant in time of the shot – and the angle and location at which the shot enters the target – is not indicative of the instant, and angle, at which the officer <u>decided</u> to fire, or at which he <u>initiated</u> the finger/trigger movement that, a fraction of a second later, discharged the shot.

Firing service pistols like the M&P .40 caliber sidearms used by Officers Allen and Powell, my timing tests and those of many other instructors and researchers indicate that officers can typically fire at the rate of at least 4-5 shots per second (one shot every 0.25 to 0.33 second), with some officers firing at the rate of 0.20 second "split times" (shot-to-shot times).  The PGCPD range was unavailable when I visited the area on January 8, 2016, so I was unable actually to time Officers Allen and Powell, which I would expect to do, using an electronic timer, in the near future.  However, based on my experience, training and research, I would expect their shot-to-shot times to be within the approximate range I have discussed.

**<u>Time to Stop Shooting, and The Physical Evidence.</u>**

Police are trained that their purpose in shooting is "to stop the threat," and that once they begin shooting, they should continue shooting until they perceive the threat has been stopped.  They are not, in other words, taught to fire a shot or two and then stop to try to evaluate the physiological effect their shots may have had on the attacker – if their shots have hit the attacker at all.  If the officer were to pause in that way, the attacker could pull the trigger of his gun, or lunge toward the officer or some other victim with his knife, or take refuge behind cover where the officer's further shots could not reach him – or, in this case, strike Officer Allen again with the car, or drag him down the road.

Just as a certain reaction time lag is a fact of human performance in an officer's beginning to fire once he perceives a threat at which he has been trained to fire, similarly there is also a reaction time needed to <u>stop firing</u> when an officer perceives that the threat that justified him in firing has ceased.

Research has shown that, due to the limitations of human perception and reaction time, compared with the speed at which the trigger of a firearm can be pulled, it should be expected that an officer who is involved in firing a series of shots at a life-threatening suspect  may fire several shots after the instant at which an "instant replay" might suggest the suspect had, at least theoretically, ceased to pose a threat.   See, *Time to START Shooting?  Time to STOP Shooting? The Tempe Study*, by Dr. Bill Lewinski and Dr. Bill Hudson, THE POLICE MARKSMAN, September/October 2003; and  "New Developments in Understanding the Behavioral Science Factors in the "Stop Shooting" Response," W. J. Lewinski and C. Redmann, *Law Enforcement Executive Forum,* 2009, 9(4).  In the human factors laboratory, where stress levels are low and the "stop firing" signal is unambiguous, subjects typically fire one to two shots after the "stop

firing" signal is given.  However, the researchers pointed out their expectation that, in an actual life-and-death shooting situation, where the stress level is extremely high and the determination to cease firing must often be made based on the perception and analysis of far more complex and ambiguous data – for instance, whether the suspect is down for good, or is getting back up again – an officer might fire more than the 1-2 "after the signal" shots seen in the laboratory study.

Based on the speed with which these officers can draw and dry fire, and data about how fast most officers can fire shot-to-shot, it is quite possible that Officer Allen's six shots could have been fired in about a second and a half (1.5 seconds) from first shot to last, and that Officer Powell's three shots could have been fired in about half a second (0.5 second) from first shot to last.  This was, in other words, not necessarily a long event, by any means.

As mentioned above, while I have an opinion about the speed at which these officers could likely have fired based on my experience, training, and research, I would like to actually time them electronically so that the jury has actual data from these very officers, using their holsters and guns.

The bullet strikes on the Honda, and the gunshot injuries of Barksdale and Jones, are in my opinion consistent with the officers firing as they have described, at a vehicle that was turning and accelerating as they fired.

**Officer Allen Was Not "Safe" Even If The Front Of The Honda Had Passed Him.**

Even if the front bumper of the Honda had passed Officer Allen (after striking him, if his account of what occurred is accurate) before his first shot actually discharged, that does not mean that Officer Allen was, by that time, already "safe."  Cars can swerve and change direction at the slightest movement of the wheel, and a car that has passed an officer can be put in reverse to strike or run him over again.  This has, in fact, happened to more than one police officer or other victim, and police officers know this. Courts have recognized this as well, and I have sometimes covered these cases in my "use of force" training classes. Going back to our discussion of the "elements of justification.," having just driven his vehicle at a police officer and (by the officer's account) striking him, Barksdale was still in possession of a deadly weapon in the form of the car ("ability"), was still close enough to Officer Allen to change direction and hit Allen in a very short time ("opportunity"), and had already evidenced an intent (or at least a willingness) to place the officer's life in "jeopardy" or "imminent danger."

Saying that the officers' justification for firing disappeared the instant the Honda's bumper passed Officer Allen would be akin to saying that an officer would be justified in firing only when a fleeing murderer points the gun at the officer, and that the officer's justification disappears the instant the muzzle of the murderer's gun points away from the officer.  The fact is, when the suspect still has the deadly weapon under his control, and is still close to the officers or other potential victims, and has already evidenced the willingness to do them serious bodily harm, the officers are, by standard and well-accepted police training, still justified in firing, and in fact are trained to do so.

10

**Location of Ejected Shell Casings.**

I note that plaintiff's expert, Mr. Balash, did some ejection pattern testing with the officers' handguns. I believe this would be of little value in this case, for several reasons. First, many of the cartridge cases were dented, crushed, or otherwise deformed, indicating they had been driven over by cars that passed through the incident scene after the officers left to pursue the Honda, and before the scene was controlled and the locations of the fired cases were marked. This same passage of traffic on the roadway can account for the fact that it appears two of the fired cases were not found at all. Second, the roadway is not level, which can allow empty shell cases to roll, especially when influenced by the breeze of passing cars. In addition, Mr. Balash fired the handguns one-handed using his left hand, whereas both officers fired two-handed (except possibly for Officer Allen's first shot), and are right handed. This difference in the way the handgun is supported can cause a difference in ejection patterns. Finally, the ejection pattern of a handgun will depend on the vertical and horizontal planes in which the handgun is held. If, for example, Officer Allen fired his first shot, as he was scrambling back to an upright position, with the handgun rotated somewhat counterclockwise from the vertical plane, this could account for the single ejected shell casing found on the far side of the roadway. A casing can also land and lodge on an officer's clothing or shoes, and fall off as he moves – such as in this case could have occurred when the officers crossed the road to get back in their car and pursue the Honda. In any event, I do not note any argument or discussion in Mr. Balash's report based on his ejection pattern testing, so I take it he does not feel any aspect of his testing has any significant bearing on his analysis of this case.

Given the variables involved, in my opinion, there is nothing in the locations in which the fired shell casings were found that is inconsistent with the accounts of Officers Allen and Powell.

**Officers Allen's Radio Broadcast.**

Mr. McCauley opines, on page 12 of his report, that based on his experience, Officer Allen's failure to state immediately over the radio that he had been struck by the Honda in the "shots fired" call he transmitted should evoke suspicion as to whether or not he was actually struck. My experience, to the contrary, is that officers' radio broadcasts after shots have been fired are often disjointed and incomplete. In one case I worked on in New York City, an officer who had been dragged some 70 feet by a vehicle after the driver purposely closed the officer's arm into the door and stepped on the accelerator, reported to his first-arriving supervisor, when asked what had happened, "he hit me, and I shot him." Officer Allen, who if giving an accurate account of what occurred, had just escaped being run over by the Honda, had been struck by it, and had fired in what he believed to be the defense of his own life, should not be criticized for not sending out the most detailed and coherent radio broadcast.

In modern police firearms training drills, I and other progressive instructors have officers practice, on the range, sending in "shots fired" radio calls after they fire, to train them to include essential details such as their location, and whether an ambulance is needed at the scene. One of the details that neither I nor any other instructor I have observed has had our trainees include in their practice radio transmission is the <u>reason</u> that the shots were fired – such as "Shots fired – I

11

fired because he came at me with a baseball bat." It just isn't essential information to include in the first radio transmission. I disagree with Mr. McCauley.

## Perceptual and Physical Changes Under Stress.

Police officers and others who are subjected to the high stress of a life-and-death confrontation such as this typically experience what is called a "fight or flight" or "adrenalin dump" response, or "body alarm reaction" ("BAR"). In many officers, this body alarm reaction causes perceptual changes and physical responses that have been widely studied, are the subject of numerous scholarly and scientific articles, and have been part of the training curriculum of law enforcement officers and their instructors throughout the country for several decades. See, generally, "Perceptual and Memory Distortion During Officer-Involved Shootings," by A. Artwohl, Ph.D., *The FBI Law Enforcement Bulletin*, October 2002; U. Patrick and J. Hall, In Defense of Self and Others, at p. 110-113; "Stress Reactions," by Bill Lewinski, Ph.D., *Police Marksman* (May/June 2002); "Critical Incident Amnesia: The Physiological Basis and the Implications of Memory Loss During Extreme Survival Stress Situations," by Lt. Col. Dave Grossman and Bruce Siddle, *The Firearms Instructor,* Issue 31 (August 2001).

Some of the most common perceptual changes or distortions included auditory exclusion, tunnel vision, and a distorted sense of time – usual "slow-motion time" – during the shooting itself.

"Auditory exclusion" is a stress phenomenon in which officers and others involved in shootings and other life-threatening events do not hear, or hear only faintly, sounds that would normally be easily heard. I have worked in numerous cases, debriefed officers after shootings, and have had several experiences myself where auditory exclusion prevented me from hearing everything from shots fired, to someone yelling in my face.

Distorted perceptions of gunshots, where they are coming from, and who is firing them can sometimes produce results that are almost bizarre. In a case I worked on for the U.S. Department of Justice, involving the fatal shooting of a man at the White House, a federal officer who immediately reported to his supervisor that he had fired the two fatal shots had, in fact, not fired at all. The shots had been fired by another officer, from a different location and direction. In many other cases, officers who have indeed fired cannot recall having done so. See Artwohl, "No Recall of Weapon Discharge," Law Enforcement Executive Forum, Vol. 3, Number 2, Pages 41-49 (2003).

Another common stress effect during deadly force incidents is tunnel vision, in which an officer will focus his vision tightly on the weapon being pointed at them, resulting in the officer having little, if any, awareness of what is to either side of the weapon. Officers and other crime victims who have weapons pointed at them often have greatly reduced peripheral vision, and often cannot even describe the facial features, clothing, or other details of the suspect who was holding the weapon. A popularized demonstration of non-stressed "selective attention" is presented in Professor Daniel Simons' video, "The Invisible Gorilla."

12

In one of the most extreme cases of tunnel vision I have encountered, an officer I interviewed who had traded shots in broad daylight with a kidnapper 31 feet away in a schoolyard never saw the car driven between the two of them by a teacher frantically trying to escape the shooting. The officer swore he and the kidnapper were the only ones present in the schoolyard, and that no car had ever moved between them.

In another case, a fatal shooting in my own sheriff's department, two of the four deputies I debriefed had no recollection of several cars parked on both sides of the subject vehicle.

Because our ability to judge distances and the sizes of objects depends in part on our seeing the object in perspective, along with the other things around it, a common aspect of tunnel vision, and the loss of peripheral vision that accompanies it, is that people who are threatened with a weapon, or even people who are in inherently threatening situations where no weapon is displayed, are often unable to accurately judge the distance between themselves and the threat. I have had this experience myself, have observed it in other officers in cases in which I have worked, and have studied and taught on this subject for many years.

Another frequently-occurring stress effect is a distorted perception of time. For many officers involved in shootings, the shooting itself seems to take place in slow motion – just as many people may experience an automobile accident or other life-threatening experience as taking place unusually slowly. Less frequently, involved officers report that things seemed to happen unusually fast

In addition to the perceptual changes often experienced by officers and others involved in shootings and other life-threatening events, physical changes take place as well. We are all familiar with the effects of adrenaline or the "body alarm reaction" on our system; our hearts beat faster, our breathing rate and volume increases, trembling of the hands is common, there is a loss of fine motor coordination, accompanied by an increase in strength and in pain tolerance. Modern research shows there is often an inability to focus the eyes on nearby objects, including certain types of weapon sights. These physical changes are recognized and taken into account in the design of law enforcement firearms, firearms handling techniques, and firearms and tactics training programs, as otherwise we would be trying to train officers to perform tasks in ways that would be difficult or impossible for them under the stress of a life-or-death confrontation. Despite our efforts in this regard, it is common, as indicated above, for officers in shooting to have only about 20-25% hit ratios despite the very close nature of most officer-involved shootings, and despite the fact that these same officers will score 75-100% on their agency's 25-yard handgun qualification course.

Based on my interviews with Officers Allen and Powell and the nature of what occurred, it is apparent that this was an extremely stressful event that affected their normal perceptual abilities. Thus, Officer Powell did not know how many shots he fired, or how many his partner fired. He indicated to me in our interview that he did not hear his shots or Allen's shots, or feel the recoil of his handgun, and that during the critical portion of the event, "everything slowed down." Officer Allen did not know how many shots he fired at the time, doesn't recall whether or not he heard the sound of his shots, and said it seemed to him like everything was happening

unusually fast as the car came toward him, struck him, and he began firing. He said that when he fired, he fired as fast as he could.

Just as recruits and in-service officers are trained in these stress-caused changes, jurors should be introduced to them as well, so they do not make the mistake of expecting officer performance, whether in marksmanship, coordination, vision, hearing, distance judgment, or awareness of how many shots one has fired, to be the same as it might be during a non-stressed firearms practice session on a sunny day at the shooting range.

## Conclusion

In addition to the facts and opinions discussed above, I offer the following concluding opinions, all to a reasonable degree of professional certainty in my fields of expertise:

If the accounts of Officer Allen and Officer Powell accurately describe their perceptions of what occurred on April 5, 2014, their actions in firing at the driver of the black Honda that drove toward Officer Allen, striking him and knocking him over, were in keeping with accepted standards and widely taught police use of force standards, in keeping with the Use of Force Policy of the PGCPD, and consistent with what reasonable officers at the scene would do in these circumstances. It is not correct that Officer Allen was no longer in danger when he and Officer Powell began firing. While it is humanly impossible for an officer to terminate a rapid series of shots instantly the instant that a deadly threat theoretically ceases, the officers in this case ceased firing within a reasonable time after they perceived that the deadly threat to Officer Allen had ceased.

If the accounts of the officers accurately describe their perceptions of what occurred, the injuries suffered by the plaintiff could have been avoided by his not jumping into the moving car when the police ordered him not to get into the car, and if his colleague had not driven the car over a curb and toward a uniformed police officer in broad daylight, while two police officers were commanding him to stop the car.

I reserve the right to amend or supplement this report in the event further information becomes available, including but not limited to my performing the electronic timing tests of the officers firing, mentioned in this report. In addition, I note that I have had what I consider to be inadequate time to respond properly to the reports of plaintiff's experts, which I have just recently received. I know that plaintiff's counsel has agreed that I could have more time to respond, and I am advised that a motion granting more time has been filed with the Court. I would hope the Court would allow me more time for additional response.

Very truly yours,

Emanuel Kapelsohn

14